990 So.2d 1214 (2008)
GALLAGHER BASSETT SERVICES-ORLANDO and Delta Health Group d/b/a Windsor Manor, Appellants,
v.
Billie Gene MATHIS, Appellee.
No. 1D07-5234.
District Court of Appeal of Florida, First District.
September 22, 2008.
*1215 William H. Rogner and W. Rogers Turner, Jr., of Hurley, Rogner, Miller, Cox, Waranch & Westcott, P.A., Winter Park, for Appellants.
David P. Dearing, Jacksonville, for Appellee.
PER CURIAM.
The employer/carrier (E/C) appeal a final order of the Judge of Compensation Claims (JCC) awarding medical and indemnity benefits to the appellee, Billie Gene Mathis (Mathis), insofar as the award authorized benefits and further evaluation and treatment of Mathis' cervical (neck) condition. E/C do not challenge the compensability of Mathis' shoulder injury and Dr. Kilgore's opinion that the August 13, 2006, industrial accident is the major contributing cause (MCC) of Mathis' shoulder condition. Because no competent, substantial medical evidence supports the JCC's conclusion that the industrial accident is the MCC of Mathis' neck condition, we are constrained to reverse that portion of the compensation order. We affirm the compensation order in all other respects.
On August 13, 2006, Mathis was employed as a certified nursing assistant by a nursing home when she tried to lift an elderly, heavier resident from a chair. Allegedly, she sensed a jerk or snap and immediately experienced sharp right arm, right shoulder, and neck pain. Mathis completed her night shift and reported to work the next day for her regular eight-hour shift, but she was hurting. After completing the August 14 shift, Mathis was physically unable to return to work again due to her injuries. It is well-documented that Mathis suffered arthritis and neck, right shoulder, and right arm pain consistently for at least 10 months before the industrial accident. On August 17, 2006, Mathis saw Dr. Restea, who took her off work. According to the testimony of Mathis' husband and the factual testimony of Dr. Shiriaeva (Mathis' personal primary physician) and Dr. Restea, Mathis reported significantly increased symptoms of pain and swelling in her neck, right arm, and right shoulder following the industrial accident.[1]
An MRI of the right shoulder was performed on August 31, 2006. An MRI of the cervical spine was taken on September 1, 2006. E/C's independent medical examiner (I.M.E.), board-certified orthopedic surgeon Dr. Rogozinski, saw Mathis on March 19, 2007. Mathis' I.M.E. is board-certified neurologist Dr. Kilgore, who saw her on April 12, 2007.
The cervical MRI indicated neck problems. Mathis filed a petition for benefits seeking medical care, past-due indemnity benefits, penalties, interest, costs, and attorney's *1216 fees. E/C defended on the grounds, inter alia, that no accident or injury had arisen out of or in the course and scope of employment; that no timely notice of the accident was given; that the industrial accident was not the MCC of Mathis' conditions, need for treatment, or disability, especially relating to the neck; that no temporary total disability (TTD) or temporary partial disability (TPD) benefits were due or owing; that Mathis' wage loss was not causally related to the industrial accident; that no medical evidence substantiated disability; and that no penalties, interest, costs, or attorney's fees were due or owing. E/C denied compensability, alleging the medical conditions at issue are all pre-existing.
Specifically citing the deposition testimony of Dr. Kilgore, the JCC determined that Mathis' ability to work is significantly restricted, that E/C failed to show that they made any reasonable effort to accommodate these restrictions, and that Mathis is entitled to TPD benefits as a matter of law from August 15, 2006, through the date (September 7, 2007) of the final order. The JCC found that Mathis had satisfied the statutory reporting requirement for work-related injuries. The JCC awarded TPD benefits plus penalties, interest, costs, and attorney's fees, and authorization of an appropriate physician to evaluate and treat Mathis. In pertinent part, E/C's motion for rehearing asserted that no competent, substantial medical evidence supports the conclusion that the industrial accident is the MCC of Mathis' present neck condition. Upon the denial of their motion for rehearing, E/C filed this appeal.
The JCC's factual findings are presumed correct and are reviewed for competent, substantial evidence. See Trujillo v. S. Wine & Spirits, 525 So.2d 481, 483 (Fla. 1st DCA 1988); Rinker Materials Corp. v. Hill, 471 So.2d 119, 120 (Fla. 1st DCA 1985). E/C do not challenge the compensability of the shoulder injury and Dr. Kilgore's opinion that the industrial accident is the MCC of Mathis' shoulder condition. The only issue on appeal is the compensability of Mathis' cervical condition. E/C question whether competent, substantial medical evidence supports the JCC's factual findings relating to Mathis' compensable neck injuries:
As for the medical opinion testimony, I accept the testimony of Dr. Kilgore over Dr. Rogozinski with regard to diagnosis and causation. Dr. Kilgore testified that after examination of the claimant and review of her past medical records, including MRI reports made before August 13, 2006 [the date of the industrial accident], it was his medical opinion within a reasonable degree of medical certainty that Mrs. Mathis suffered a right rotator cuff tear and a significant exacerbation of her preexisting cervical degeneration resulting in greater pain and new radiculopathy in her right upper extremity. Because the rotator cuff tear and right upper extremity radiculopathy occurred in temporal association with the lifting of the resident as described by Mrs. Mathis, Dr. Kilgore opined that this event was the major contributing cause of her present condition. He also opined that further diagnostic studies and treatment would be necessary to determine whether there is additional cervical disc injury following the work accident, and whether there is combined involvement between the neck, shoulder and arm conditions.
The shoulder and neck MRIs showed a 95% supraspinatus tear[2] and two-level discherniations *1217 in the neck at C5-6 and C6-7 with some disc extrusion, by report. Dr. Kilgore testified that Mathis had continuous arm pain that required analgesics daily. She was not actively working. A spinal examination revealed a loss of rotation in the neck and spasm and cording of the muscles in the posterior cervical and inner scapular area. Mathis' low back examination was normal. Dr. Kilgore's diagnostic impression was a right rotator cuff tear, almost complete cervical radiculopathy, right possible, and C5-6 and C6-7 disc herniations with underlying cervical spondylosis.
Dr. Kilgore was asked whether he had an opinion (based on his examination, the medical records, and the deposition testimony of Dr. Shiriaeva) as to whether Mathis' shoulder injury is "directly related" to the industrial accident injury described by Mathis. Over an objection, Dr. Kilgore answered:
I do have an opinion, and that opinion is that the shoulder injury and rotator cuff tear occurred in temporal association with the lifting of the patient that she described and was causative in the shoulder pain developing.
Next, Dr. Kilgore was asked whether the industrial accident is the MCC of Mathis' shoulder condition. Over another objection, the doctor opined affirmatively. Dr. Kilgore was asked what medical significance he would ascribe to the history given to Dr. Shiriaeva, and given by Dr. Shiriaeva to Dr. Kilgore. Over a vagueness objection, Dr. Kilgore answered:
The history that the patient gave me and the history that she gave Dr. Shiriaeva were pretty much the same, that she had no shoulder complaints, that she was attempting to mobilize a much larger patient; the patient was having difficulty in getting up, and it required three or four attempts, which this heavy patient falling back into the bed each time she attempted to lift him up.
That caused her to develop the right shoulder and neck pain, and over the ensuing hours, that pain was accompanied by visible swelling and limitations in motion of the joint area where she was symptomatic. And those findings were visibly apparent to the primary care physician when the initial examination occurred the following day.
So I think the temporal profile, the objective signs of swelling and limited mobility, were all consistent with an acute injury in that area.
Dr. Kilgore opined that Mathis needs orthopedic assessment for therapy and, if that does not alleviate her pain, she needs a surgical correction of the shoulder tear.
At that point in the deposition, Mathis' attorney asked the all-important question: "Are you able to testify, with any medical certainty, with regard to whether any of her cervical problems may relate to this on-the-job injury?" Dr. Kilgore answered:
Historically, she reported radiating pains and paresthesias in the right arm, which are consistent with the disc being symptomatic. She had preexistent neck and disc problems.
The difficulty I have is, not having seen previous records, I don't know how to quantify what's present now and what preexisted. The way to do that would be to do a neurophysiologic examination, looking for acute denervative changes that would help you. And you can actually tell acute versus chronic nerve root *1218 compression by neurophysiologic examination.
The timing of this now isit's almost a year, so we've probablywe're getting out to the area where it's going to be difficult to tell what's new and old except my medical records.
The direct examination of Dr. Kilgore concluded with those inconclusive answers relating to the neck condition. The following question was asked on cross-examination:
Q. Are you comfortable in saying that there is an element of a preexisting injury or condition relating to this lady's neck and right shoulder?
A. I think that there's a preexistent condition relating to her neck. I don't think that the pain that was described or the descriptive terminology in the medical records supports that it was of a shoulder origin. I think it was more likely of a cervical origin.
Dr. Kilgore declined to defer to Dr. Rogozinski's opinions regarding causation and the need for any type of treatment related to the industrial accident. Later on cross-examination, the following questioning occurred:
Q. But the claimant did not tell you about any of these prior right shoulder problems, so you didn't have an opportunity to ask her if what was going on before this accident was different than what she's experiencing now, correct?
A. I assumed, based upon the history that I got, that the primary shoulder pain that she was having was different. It was accompanied by acute changes of injury with swelling and immobility, none of which she had previously by her history or I would have written it down. And I know about the neck from the previous medical records.
The only thing I can't tell you is what part this injury played in terms of worsening the cervical disc symptomatology. I can't apportion that out because the medical records that I've seen up to this juncture are inadequate to do that.
Q. So it's your testimony that, even though she did not report any prior right shoulder problems, there's right shoulder complaints in the past medical records, but you don't feel that those are the same type of complaints that are the complaints that she's presenting now?
A. You're picking shoulder out exclusively and asking me about shoulder. That's not what the medical record says. The medical records says neck and shoulder and arm and back.
People who injure their shoulder complain of shoulder pain. She didn't come in and say: My shoulder hurts. She came in and complained: My neck hurts; my shoulder hurts; my arm hurts. And that constellation of symptoms, to me, represents more likely a cervical than a shoulder source.
Q. Are you of the opinion that any preexisting condition was going on with her shoulder that affects the current symptomatology?
A. I can't extract that from the medical record independent of the neck.
Q. Are you giving an opinion that her neck pain or problems are causally related to this reported accident?
A. As I told you, I can't quantify whether the neck pain was exacerbated by this accident or not because she had neck and arm symptoms preexisting this accident, but they're poorly quantified in the record.
She has them after this accident and really isn't complaining very much of anything different to make a characterization possible.
Q. Is there any neurological element to her shoulder injury that you're describing?

*1219 A. There could be some referred pain from the disc. It's the appropriate level to cause referred shoulder pain, but it wouldn't cause limits in range of motion of the shoulder joint, and it wouldn't cause acute swelling in the shoulder joint.
That's what makes it difficult to separate out the cervical from the primary shoulder.
All of Dr. Kilgore's answers were given within a reasonable degree of medical certainty. Given this testimony of Dr. Kilgore, E/C convincingly argue that no medical competent, substantial evidence supports the JCC's conclusion that the industrial accident is the MCC of Mathis' neck condition. See § 440.09(1), Fla. Stat. (2006).[3] E/C correctly argue also that, regarding the MCC issue as it relates to the neck condition, the JCC cannot rely on the fact testimony of Dr. Shiriaeva or the lay testimony of Mathis and her husband that Mathis' pain level increased significantly after the industrial accident.
In fact, the only evidence points to the opposite conclusion. Dr. Rogozinski opined that "a longstanding aging process" is the MCC of Mathis' cervical spondylosis. He attributed the diagnosis of right AC joint arthritis to a "longstanding" cause as well. He opined that the AC joint arthritis caused the chronic attrition and final tear of the rotator cuff. Dr. Rogozinski testified that the MCC of both conditions (and any need for treatment of the three diagnoses) is preexisting. He explained that the fact that Mathis has degenerative changes within the AC joint on the MRI scan, by definition, implies that it impinges on the rotator cuff; and that the attrition and the rubbing of the rotator cuff causes it to become thinned, so that a trauma precipitates the ultimate failure of the rotator cuff. He opined that "this is an attritional type of rotator cuff possibly super imposed with an injury." Although the JCC did not have to accept Dr. Rogozinski's medical opinions on causation, Mathis had the burden to prove "by medical evidence only" that the industrial accident is the MCC of her neck condition. See § 440.09(1), Fla. Stat. (2006); Mitchell v. XO Communications, 966 So.2d 489, 490 (Fla. 1st DCA 2007). It is not E/C's burden to disprove MCC in connection with the neck condition.
Both I.M.E. physicians agreed that Mathis has a torn rotator cuff, but they disagreed over the MCC. Competent, substantial evidence from Dr. Kilgore supports *1220 the finding that the industrial accident is the MCC of Mathis' shoulder condition. Therefore, we affirm the award of TPD benefits from August 15, 2006, noting also that, in a very professional manner, E/C's counsel stated at oral argument that E/C are not challenging the award of TPD benefits. However, absent competent, substantial medical evidence, the record compels reversal of the JCC's conclusions that the industrial accident is the MCC of Mathis' cervical condition and that the neck problem is compensable. Therefore, the authorization of a physician to evaluate and treat Mathis is limited only to her shoulder condition, not to her neck condition.
To the extent that it is unclear from the instant record whether a physician would be able to evaluate and treat Mathis' compensable shoulder injury (as to which the industrial accident is the MCC) without, at least in part, dealing with Mathis' noncompensable neck condition, we note that the workers' compensation statutes help to define the scope and nature of the medical treatment and care to be provided in such instances. Section 440.13(2)(a), Florida Statutes (2006), states in pertinent part that, "[s]ubject to the limitations specified elsewhere in this chapter, the employer shall furnish to the employee such medically necessary remedial treatment, care, and attendance for such period as the nature of the injury or the process of recovery may require...." Section 440.13(1)(l), Florida Statutes (2006), states:
"Medically necessary" or "medical necessity" means any medical service or medical supply which is used to identify or treat an illness or injury, is appropriate to the patient's diagnosis and status of recovery, and is consistent with the location of service, the level of care provided, and applicable practice parameters. The service should be widely accepted among practicing health care providers, based on scientific criteria, and determined to be reasonably safe. The service must not be of an experimental, investigative, or research nature.
Additionally, our decisions provide directions as to how to deal with such circumstances. See, e.g., Mellon Sec. & Sound v. Custer, 687 So.2d 1372, 1373 (Fla. 1st DCA 1997) (affirming JCC's determination that "E/C were responsible for providing the claimant with treatment for obesity and hypertension because the treating physicians agreed that treatment of these conditions was medically necessary to the claimant's treatment and recovery from the compensable injuries to his back and neck"); City of Miami v. Korostishevski, 627 So.2d 1242, 1244 (Fla. 1st DCA 1993) (affirming compensability of claimant's hernia as well as JCC's finding that E/C were responsible for treatment of claimant's liver cancer only to the extent "necessary to effectively treat the hernia," and explaining that treatment for a condition not causally related to the compensable injury is E/C's responsibility "if one of the primary purposes of the treatment is also removal of a hindrance to recovery from the compensable accident") (quoting Roth Bros. of Fla. v. Spodris, 451 So.2d 947, 947 (Fla. 1st DCA 1984)); Urban v. Morris Drywall Spray, 595 So.2d 60 (Fla. 1st DCA 1991); Parish v. Baptist Hosp., 512 So.2d 1031 (Fla. 1st DCA 1987).
We AFFIRM the compensation order in part and REVERSE in part.
BROWNING, C.J., KAHN and THOMAS, JJ., Concur.
NOTES
[1] The testimony of Drs. Shiriaeva and Restea was considered for factual purposes only, not for medical opinion purposes.
[2] The rotator cuff comprises a muscle group that comes from the shoulder and from the scapula (shoulder blade) and inserts to hold the shoulder or the arm to the shoulder socket. The supraspinatus muscle is one of those muscles. Mathis' shoulder tear injury involved the tendon insertion of that muscle to bone.
[3] In pertinent part, this provision states:

440.09 Coverage.
(1) The employer must pay compensation or furnish benefits required by this chapter if the employee suffers an accidental compensable injury or death arising out of work performed in the course and the scope of employment. The injury, its occupational cause, and any resulting manifestations or disability must be established to a reasonable degree of medical certainty, based on objective relevant medical findings, and the accidental compensable injury must be the major contributing cause of any resulting injuries. For purposes of this section, "major contributing cause" means the cause which is more than 50 percent responsible for the injury as compared to all other causes combined for which treatment or benefits are sought.... Pain or other subjective complaints alone, in the absence of objective relevant medical findings, are not compensable. For purposes of this section, "objective relevant medical findings" are those objective findings that correlate to the subjective complaints of the injured employee and are confirmed by physical examination findings or diagnostic testing. Establishment of the causal relationship between a compensable accident and injuries for conditions that are not readily observable must be by medical evidence only, as demonstrated by physical examination findings or diagnostic testing. Major contributing cause must be demonstrated by medical evidence only.